I understand our Deputy Clerk had to come out and tell you to get the lead out? Yes. Yes, Your Honor, but it was waste lead. It wasn't your fault. I wasn't specific. These unspecific orders once again. All right. The next case on calendar is California Department of Toxic Substance Control v. Alco Pacific. Counsel? Good morning. Good morning. May it please the Court, Counsel? My name is Ed Ochoa. I'm a California Deputy Attorney General, and I represent the opponent, the California Department of Toxic Substance Control. Your Honor, this case presents the issue as to whether the defendant's transactions in selling the dross and slag to Alco Pacific constitute the arrangement of treatment and disposal of hazardous waste. In determining that issue, the Ninth Circuit considers that question in the context, first, of CERCLA's broad remedial objectives. One, that contaminated sites be properly cleaned, and two, that the sites be cleaned by those that had some connection to the contamination. As compared to those that did have connection to the contaminated site versus taxpayers, this Court has held that those parties should be liable as arrangers. Now, in this case ---- Wait a minute. Some connection isn't what the statute says. I mean, there are lots of people that have some connection that aren't held liable. I understand the thrust of your argument is we read the statute liberally and so forth, but there is still some content to the statute that has to be satisfied. That's correct, Your Honor. The statute 9603 requires essentially that the party, the responsible party, by contract, by an agreement, or otherwise, arrange for the treatment or disposal of a hazardous waste. Now, CERCLA does not define what the term arrange means, but this Court and other circuits have interpreted that term broadly, and again, in order to effectuate the intent and broad and real objectives. This Court recently stated in the case of United States versus Burlington Railroad, a case decided on March 16th, that even a minimal connection to the contaminated site is enough to impose liability on an arranger. In Burlington, we had a situation where the defendant, Shell, essentially was selling a legitimate product. It was a useful product. It was a useful product, Your Honor. And that product ---- But it leaked. But it leaked. It leaked when ---- Right away. Yes. The product leaked. I'm familiar with the case. Very well, Your Honor. Here we have a situation where the defendants generated byproducts as a result of their manufacturing operations. None of the defendants in this case, Your Honor, created intentionally the byproducts that were sold to Alpha Pacific. Well, they weren't surprised by the byproducts being there. I mean, gee, we've got leftover from our first run through the smelter. I mean, they know it's going to happen. That's correct. All of these defendants understood their operations. They were sophisticated parties. They are sophisticated parties. They understood that as a result of creating these products, in the case of RSR and Quameco, actually RSR does not sell any products. RSR is, in a true sense, an arranger, because they arrange the transactions between Quameco and Alpha Pacific. But with respect to defendants RSR and Quameco, they operated also a secondary lead smelting facility. They were in the business of selling lead. As a result of that business, manufacturing, extracting lead from secondary materials, they created a byproduct called slag. But that contained lead itself, right? That's correct, Your Honor. So why wouldn't they fit into the why is that a byproduct? I mean, they create pure lead, and they also create a slag and dross, or one or both, which contain lead but need a further step to remove the lead, correct? Yes, Your Honor. The byproducts contain lead, and the parties all recognize. That's their business, though. Their business is to sell lead. Get the lead out? Get the lead out, right. No, that's ALCO's business is to get the lead out. That's correct, Your Honor. Their business is to sell refined lead. Their business is not to sell byproducts, waste products. Essentially, when they smelt the lead out of battery parts, which was the primary material that RSR and Quameco and ALCO Pacific, this facility, when they smelted the lead out in the furnaces, what was left over was the molten metal lead and the waste byproduct called slag. And that slag was dumped out. By calling it waste, you've answered the question in defining it, because waste suggests you're just going to dump it. There's no useful purpose to it, and yet, in fact, we know that it is used for something else. So how can you assume that it's waste? It's waste because the defendants themselves manage the material as waste. For example, PK Metal, when it generated the dross, when it skimmed. Now, wait a minute. You were talking about Quameco. Now you're shifting to another. Well, I'm giving a clear example, Your Honor, but staying with Quameco. In the context of the smelting operations, they generate a waste. They themselves acknowledge and admit that that slag, once generated, has to be managed as a hazardous waste. Hazardous waste or hazardous material? Hazardous waste, Your Honor. They, in their deposition, RSR and Quameco indicated that when the slag is generated, it can either be processed again, right, in their electric arc furnace, and again, essentially what happens in the furnace is the lead that's in the slag is removed again, and more slag is created. That slag that is generated in that process has to be disposed of as a hazardous waste. It was their responsibility to make sure that that slag that they generated was properly disposed of. In essence, it is a hazardous waste disposal problem. I just want to make sure I understand the facts on the ground correctly. Yes, Your Honor. So the lead is smelted by Company A, and that process creates slag and dross, correct? And then that slag and dross can be used again. You can take more lead out of it. And that can be done by Company A or it can be done by Company B or it can be done by Company C. But you never get 100 percent of the material converted into something useful. Is that right? That's correct, Your Honor. And at some point in the process, whether it goes through 1, 2, 3, 5, or 10 resmelting processes, there is waste material left over. That's correct. And all of these defendants understood that, Your Honor. And so that's – I'm right on the facts then. So are you essentially making the argument that this is really the situation that was present in the Catellus case, where you're sort of transferring the responsibility for the disposal of that part of the product that is waste from the company at the beginning of the process to the company at the end of the process?  In Catellus, of course, the defendant there, General Automotive, was in the business of fixing cars. And in that business, they accepted clients, customers to use batteries. General Automotive was not in the business of selling used batteries. They sold, though, the used batteries to a secondary smelting facility, coincidentally named Morris P. Kirk & Sons, the father and grandfather of Morris P. Kirk, the owner of Alka Pacific. So in Catellus, General Automotive sold used batteries that contained lead. They were useful to the smelting facility, Morris P. Kirk. And Morris P. Kirk paid money to General Automotive for those batteries. And those batteries were sent over and accepted by Morris P. Kirk. Morris P. Kirk then crushed the batteries, removed the lead components, tossed the lead components into the smelting furnace, and then the byproducts, if you will, the chips, the plastic casings of those batteries that contain lead, were disposed at the Catellus property. And in that case, this court said that was sufficient to impose a ranger liability on General Automotive. So here we have a more direct connection. Here we have the rangers actually selling their waste byproducts to Alka Pacific, where at the Alka Pacific site, not at a third site like in the Catellus case, but at the Alka Pacific site, those waste byproducts were treated and they were released into the environment. This case also is similar to the Cadillac Fairview case, Your Honor. In that case, again, this Court said that the rubber company's removal of contaminants in a chemical known as styrene, which was used to make rubber, this Court indicated that even though the rubber companies were selling back the contaminated styrene to the company that removed the contaminants and then sold the clean styrene back to the companies, the Court said even though money was paid, essentially, nine cents for the clean styrene and seven cents is what the rangers were paid for, for the contaminated styrene they sold back, the Court said essentially that is an arrangement for the treatment and disposal of a hazardous waste because the difference, the two-cent difference in price is enough in order to impose liability under the arranger classification under Circle. Roberts. What about the market value argument that the defendants are making here that distinguishes this case from Cadillac Fairview? Yes, Your Honor. The material had market value in the sense that the price paid on a per pound basis was determined on the market value of lead, not the market value of lead dross or market value of slag. It was dependent on the market value of lead. But when you actually look at the price paid, it's a nominal sum. It varied from 2.5 cents to 12 cents per pound versus the 26 or 32 cents per pound of lead. So you have two different, very different types of materials being sold. And this Court in the Catullus case and in Cadillac Fairview indicated and the defendants in those cases asserted, hey, these materials have market value. This Court said, yes, we understand that, but we need to look beyond the characterization that these materials are the sale of a useful product. We need to look at the arrangements themselves. Did they constitute, did these transactions, even though they were sold and the defendant arrangers received money for them, did they constitute the arrangement for the treatment or disposal of hazardous waste? And here we believe that the record establishes, Your Honors, that yes, all of these defendants were not in the business of selling these byproducts that they sold to Alka-Pacific. They were in the business of selling lead. They were in the business of selling solder, dross. And Pazminko also operated a secondary zinc smelting facility. All of these defendants understood that they had a responsibility to appropriately manage their byproducts as hazardous waste. And if they didn't sell them to Alka-Pacific where they were treated and disposed, they themselves had the responsibility to make sure that those hazardous wastes were properly managed. Now, RSR and Quimeco say, well, we sold rerun slag. It's important, I think, Your Honors, to have a good basic understanding as to the types of materials that we're dealing with. Now, I asked the representative for RSR and Quimeco, what is second rerun slag? They couldn't tell me, but they did tell me this. They said, when battery parts are processed in a furnace, you get something called first run slag. Now, once that slag is generated, RSR and Quimeco would process that slag that still contained lead in their electric arc furnace. That was called second run slag. And then once that second run slag is processed, it is called a disposable slag. That's what they referred to it, meaning that they had a responsibility to dispose of that material as a hazardous waste. Why hazardous? Because even though these defendants, RSR and Quimeco, wanted to extract the lead, they couldn't extract all of the lead. And so the slag that was processed at Alcoa Pacific in the smelting furnaces was released into the environment, and the lead contained in the slag and in the dross contaminated the environment. Just so I understand, you said there's the first level, the first cut. First run slag. Then they come through the second. What they call second run slag.  And they use that for their own benefit. Sometimes they did, Your Honor. In this case, we contend that, and if you look to the documents themselves, the material that RSR and Quimeco sold to Alcoa Pacific was called second run slag. Which is not this. Which is not the first run slag that is generated in the first instance when the material is processed in the furnace. But then you said that when they go through the second run, then there's also leftover disposable slag. That's correct, Your Honor. Where did the disposable slag go to? The disposable slag should have gone, actually, Your Honors, to an authorized. Who did it go to? Not should have, but who did it go to? Well, it varied, Your Honor. Not to Alcoa. Not to Alcoa, Your Honor. So Alcoa's getting the intermediate. Yes. We believe, Your Honor, that the description of the material that RSR and Quimeco sold, second run slag, is the intermediate. Now, did it have lead in it? Yes. Was it approximately 40% by weight lead? Yes. But what about the other 60 or so percent of the material? Who was responsible for making sure that material was properly managed? Well, the defendants were responsible. But in this case, they chose not to accept that responsibility. They essentially arranged to have those materials treated and disposed at the Alcoa Pacific site. So just to clarify, what you're saying is that of the material that was actually delivered by the defendants to Alcoa, there was a residue of hazardous material that could not be refined out by Alcoa? That's correct, Your Honor. And the district court below was quite clear. The district court acknowledged that in the way that Alcoa Pacific processed these materials, they essentially would toss the slag that they purchased from defendants into the furnace, and when that slag was processed, the slag was dumped down into bins to allow the slag to cool. Then the slag was dumped from the bins onto the ground. And Alcoa Pacific employees would fish through the slag that's been dumped on the ground, and they would pick out, try to pick out the metal parts of the slag and toss it in bins so that it could be put again into the furnace. And also, when that slag was dumped onto the grounds, they used a payloader to pick up the slag and put it in uncovered bins. This was a very messy, very gross processing. It wasn't a clean operation, and hence why we have contamination at the site. And I think the court recognized and indicated specifically in the February 2004 order that Alcoa Pacific purchased material and tried to extract material, specifically lead, from these waste byproducts, and what it could not basically use as refined lead, it disposed. The parties understood this process, and especially those parties that were in the smelting facility business. So the district court distinguished this situation from all the other cases on what basis, that it was that they paid market value for the lead? That's correct, Your Honor. Essentially, the court considered three criteria, two of which were essentially a version of somebody paid money for these materials. And I think this Court has clearly said, under various precedent, could tell us, Cadillac, Fairview, even the A&W case, Your Honors, supports our position that the material at issue was a slag, a hazardous waste. I'd like to reserve my remaining two minutes for rebuttal. Thank you. How are you all going to divide your time? Okay. Your Honor, I'm going to address the issue on the useful product defense, and then my colleague, Mr. Frett, will address the recycling exemption issue. And you're Mr. Sarand? I am Mr. Amantea. They had Frett and Sarand underlined on the daisies. Okay. Is Mr. Sarand going to just observe? Oh, after. Okay. All right. You're Frett? Yes, I am. You're Frett. I'm confused. All right. Okay. And you represent? I am. May it please the Court. I am Chris Amantea. I represent Appalese, RSR, and Quimetco. Okay. And I will address the, on behalf of the Appalese, the useful product issue that's before the Court. And how much time are you planning to take? About 12 minutes, Your Honor. All right. So reserve eight minutes for Mr. Frett. Okay. First of all, just to address one of the points that Mr. Ochoa made, and this is indicative of the approach that they've taken to this case, he stated that the Appalese were selling waste byproducts to Alco Pacific. And that really ignores the uncontroverted facts that were before the district court. And the uncontroverted facts before the district court were that there are different types of slag and dross. All slag and dross is not created equally. There are slags, as were the slags that were sold and the drosses to Alco Pacific, slags and drosses that contained high metal content. Now, Alco Pacific was in the business of recycling and manufacturing metals. They would take scrap metal. They would put it through their furnace, and ultimately they would create products such as sailboat keels and those types of things. And their raw materials that they purchased for this process were scrap metal and included the high metal content drosses and slags that the Appalese sold to them. So this is very different than the waste, as the DTSC refers to it, selling waste byproducts to Alco Pacific. These were not wastes. These were valuable materials. And the drosses and the slags that were sold to Alco Pacific, as the Court properly found, had different characteristics than the waste dross and slags. For example, the drosses and slags that were sold had to have at least a 30 percent lead content to Alco Pacific. This is true of all of the defendants? This is true of all the defendants. At least 30 percent. At least 30 percent. That's what they needed in the material to be able to extract lead that they could use in their process. But there still was an unusable portion. Even in this high quality drosses and slags, there's an unusable portion. There's some portion that comes out and is at the back end of the process. We don't know precisely how much lead that has in it or if it has any lead. So when you say that it has 30 percent lead going in, there's no testimony that all 30 percent of that lead didn't come out. There were other materials that were mixed in that ultimately would have to be disposed of. And they were disposed of, both by Alco Pacific. Alco Pacific testified that, ultimately, the waste drosses and slags were disposed of at a hazardous waste landfill, as our clients disposed of, ultimately, what was at the other end of the process. But the drosses and the slags that were sold to Alco Pacific, for example, and there's testimony in the record that establishes they were like little pieces of shale. That was the high lead content. It was a different color. It was grayish. The pieces were like chunks that were two to four inches, and it was grayish in color. That compares to the waste dross and slag that ultimately at the very end of the process is black in color, very granular, almost to the point of being liquid because it doesn't have any metal content in it since the metal content that gives it its characteristics. So this dross and slag was very different from the material that ultimately was disposed of. Also, Alco Pacific would verify the lead content or the metal content, if it was some other metals, in the drosses and slags that it received. It wouldn't just take that dross and slag and dump it into their smelter. They verified either through the history with the companies that they were dealing with or through independent laboratory testing that it had a sufficient percentage of metals that they could use it in their actual, in their process. So just a step back since you're arguing on behalf of all defendants. Is it your position that for all of these companies, the production of 30 percent minimum content lead dross and slag was part of their normal business then? Yes. So it wasn't a byproduct. It was part of their inventory, their normal operation? Well, for example, with respect to Quinetco, they would reuse they had two choices, really, with respect to this intermediate, as the Court referred to it, this intermediate slag. They would either reuse it themselves because it had value to them as well as to Alco Pacific and others, or they would sell it. Sell it to whom? They would sell it to companies like Alco Pacific. Was there anybody else they sold it to? There's no evidence in the record of who those other parties were, but there's testimony that it would have been sold. So to others or used in their own process. With respect to PK, what was PK's product line? I would have to defer to Mr. Saran on that, Your Honor. Okay. Well, then what about Davis Wire? I will let you know about that. But Quinetco, their product line was pure zinc, pure lead, you know, pure stuff, correct? Correct. Could have sold on the general market. That's correct. But as far as the 30% slag, that went primarily, I gather, to Alco. That was a byproduct. It is a byproduct. Right. And at some point, this is the same question I asked counsel, at some point, there is going to be waste left over when that byproduct is used up. Absolutely. But in that sense, it's no different than any other raw material. As this Court held in A&W Smelter or ruled in A&W Smelter, raw materials, by their very nature, have to be processed in some way when you use them in a manufacturing process. So, yes, in that sense, they were no different than any other raw materials. They had to be processed. And at some point, at the very end of the process, there was some waste product or some waste. Just to test your theory, then, let's suppose that Quinetco went through just one smelting operation. And then it sold, didn't go through, apparently went through a second step and then sold what was left after that. Is that correct? That's correct. Okay, so let's assume that what it did, in fact, was make the first cut, took out the lead it could get. Then it had a 30% slag, which it then, in turn, sold to, you know, no second run. Just first step was get what you could on the first smelting. And then you go out and you send what's left over to ALCO. And ALCO goes through that second step. And then ALCO decides, then, to go ahead and it sells off to what's left, which would be the functional equivalent of what it did get. It's now going off to a third party. So under your analysis, the only party that would be liable would be number three in the chain, that ALCO would be off the hook because it was creating a usable product because there was somebody down the line who could extract lead out of what was left after going through the two separate company smeltings instead of two with you and then one with ALCO, to get my hypothetical. Yes, Your Honor. And, yes, under my scenario and under the scenario that the district court found was appropriate is if there was, if ALCO, in your example, if ALCO Pacific's material that came out of that smelting process after they used it from Quimetco still had a high lead content above 30 percent, say, that material had value to it. And it was something that they could sell. They themselves would not have had to dispose of that as a waste. And they wouldn't. I mean, these were companies that were in the business of using metals. And it had value to them. So how is this case distinguished from Catalis? Well, the way this case is distinguished from Catalis, in Catalis the situation was that batteries, whole batteries were sold to the ultimate recycler. And before the lead plates were all that had value of those batteries. And before the lead plates could be used, the batteries themselves had to be broken open. And what you had then was a battery casing that had residual lead on it that couldn't be used in the smelting operation and had to be disposed of. And so in that situation, the material that Catalis got couldn't be used in the form that they obtained it in. They had to do something with it before they could even put it into the manufacturing process. In the situation with the dross and the slag that ALCO Pacific had, as I indicated, it was like chunks of rock. They didn't have to do anything to that before they put it into their manufacturing process. So in that regard, it was like any other raw material. In Catalis, to get the raw material out, you had to do something before you could even use it. You had to break it open. But I'm not sure I understand that. Because one way of looking at it is in Catalis you had something left over, which was the casings. Casings didn't have any commercial value. And in the case of the dross and the slag that sold to ALCO, at some point there's going to be unusable waste. So still you're selling a byproduct or whatever you want to call it, and it gets transformed by the downline user and there's still leftover waste. Are you saying there's no waste here and there's nothing in the record that suggests that there's any waste here as a result of ALCO's smelting of the dross and slag that your clients created? No. What I'm saying is that the material that's used by ALCO is, in essence, like a raw material. That was different than the batteries. You couldn't throw the whole battery into the smelter. There is waste at the end of the product or at the end of the manufacturing cycle with respect to ALCO Pacific, as you would have with any manufacturer. But there's no waste before that? There's no waste before that because the dross and the slag that they get, and Mr. Ochoa said it himself, he said they dump it right into the smelter. So at the time that your clients part with it, it's not waste? That's correct. It's not a hazardous material? Well, it may be a hazardous material if it has lead in it, but it's not a waste. And before you get to the analysis of whether somebody's an arranger, it first has to be a waste. So, and that's the question that the district court addressed in this case. And really, if you look at this case and compare that to the five other cases that this circuit has ruled on, the situation here is very different. If you look at A&W's smelter, there was a pile of ore that had been building up for many years. The ore had gold and silver in it, which, by the acknowledgment of the parties, could not be used. It wasn't enough to be smelted. And so they had to do something with that. So they couldn't use that. There was also some slag. Now, ultimately, the court wasn't able to make a determination because the court said in A&W's smelter, you look at the commercial reality of the transaction, you look at the intent of the parties, and you look at the market value of the material. And this Court said that. And they didn't have enough information in the record to ascertain what the market value of the material was. In Asarco, you had slag material. And let me stop you right there. Yes. And ask, why is this a summary judgment case? If you have to look at all of those things, couldn't a finder of fact look at those things and look at the intent of the parties and rule, in effect, factually the other way? Say that, well, we determined that the facts here suggest that the intent of the parties was to dispose of this as waste, and as a result, the useful product exception does not apply. Because in this case, there was absolutely no evidence in the record to controvert the factors that the court evaluated. So there was no evidence. For example, the State proffered no evidence in the record of what the market value, that the market value of the lead and the other metals that were purchased by Alco Pacific was anything less than what was paid for it. I mean, they argue in their papers. Market value is arithmetic. Move to the other one. I think that's where it gets to be a little more difficult to say what the intent of the parties was. Well, to ascertain the intent of the parties, what the Court did and what you need to do in these situations is you need to look at all the factors. And the Court looked at the factors and said, this is a high metal content versus low metal content. For example, Quimetco would have reused the material itself, so it wasn't a waste. It didn't have to, quote, throw it away or get rid of it as in the other cases. Davis Wire had other sales of its products to, it didn't reuse the material, but it sold. There was a market for it. They sold it to others. And PK Metal sent its materials to Alco Pacific to get the most lead out of it and then got it back. So the Court looked at all those factors and said there was no intent as in the other part, as in the other cases, to get rid of it. They would have used it themselves. What tells us that a jury couldn't have looked at the factors or looked at the evidence submitted with regard to those factors and decide, you know, what they really were trying to do here was to get rid of this stuff they knew they had to treat specially and so they passed it down to somebody else? I'm not so sure on a summary judgment standard that a jury couldn't reach that conclusion. And if they could reach that conclusion, is the district court's order vulnerable to not being sustained because it is summary judgment? Well, like I said, in this case, I think the district court has to look at the record. The district court found, and even to look at the commercial realities of the transaction, which is how the court tried to judge the intent, and the court found that there was no evidence on the record that a jury would have been able to find in this case for the State of California. There just wasn't anything there that the court could rely on, and that's why summary judgment was appropriate. In fact, if you look at the district, the district court's opinion, order, basically sets it out. The district court said that they looked at the price that was paid. They looked at the fact that there was an established commodities market. They looked at the fact that, unlike in ASARCO, there was no desperate need to get rid of the material. They looked at the unrefuted evidence, as the court put it, into a factual inquiry into the underlying motivation of the parties. That, and as the court mentioned, it was an unrefuted record. There was no intent to get rid of this. I don't think under the facts of this case that a reasonable jury could find that there was an intent to get rid of this. These were companies that were in the business of using metals that had value. And the unrefuted record is that they would have sold this to other parties or they would have reused it themselves. So I don't see how you can find an intent under those facts that they would have had they could have gotten rid of it or it would have been a waste. Okay. You've sort of eaten into your colleague's time, so. Okay. That's all. Thank you very much. It's been a productive argument, but you're running off the clock. Good morning, Your Honors. My name is Eugene Frett, and I represent Davis Wire Corporation, which is one of the appellees here. Picking up on the last point, this is a factual matter. Sure. To understand your business. Yes. Davis Wire. Davis Wire, as its name connotes, is a manufacturer, creates wire products. And they use lead not to smelt, but they use lead to heat wire because their business is shrinking, not shrinking, but thinning out wire because there's different needs for different wire. For example, you've all been to the grocery store. The grocery carts have a very thick kind of wire. Chicken wire that, you know, farmers would use is a very thin kind of wire. So there's a process you go through, and one of the processes is, and they don't do this anymore here in California, but in other of their factories, you run it through a lead bath, which heats the wire, which allows you to then shrink the wire. So how would you, if they weren't selling the 30 percent slag and dross to Alco, what would they have done with it? They had another company that they sold to in Los Angeles. That's in the record. To do what? It's another smelting company. To do the same. Right, right. In other words, that they wouldn't have used it themselves. No. And we're not contending that they were creating wire products in order to have dross to sell. I mean, that's not the case, and that's not why they created it. What you have, though, is a product that they end up creating that has value and that it can be sold. And why in the world would we want to have this product, which has value, thrown into the waste stream when it can be used and reused and that lead can be extracted and reused to make products? If you follow the State's logic, we end up with filling up our landfills with products that actually have some use and value, but we have to treat them as waste because, God forbid, that we send them to a recycler and that that smelter, in his manufacturing process, is doesn't comply with all the requirements or ends up having occasional spills, we're going to get stuck with that bill. So here we have something that's valuable that could be reused, but if you're going to throw a liability on the recycler, he's going to be stuck. He's not going to be able to recycle. He's never going to be able to use the waste stream. You're making the recycling exception argument. No. I think that also goes to useful product defense. That's why you call them useful products. We don't want to enhance or increase the waste stream needlessly. I keep going back to Catellus, but do you have anything to add to what your colleague said about that? I mean, it was a noble thing that the used batteries were recycled, and in the process of recycling them, we created casings that had lead on them, and the liability was spread out. So how is that analytically different? It's very different, and that's because the batteries, when they came to this recycler, he took the product, the battery, broke it open, threw the casings to the side. The casings contaminated the soil. The casings had absolutely no use to that recycler. And basically, the recycler was taking the seller's product and taking the seller's waste. Here, here. And the seller was held partly responsible. Right. I understand, because that is the seller's stuff. Here, the dross and the slag, all of it is put into the furnace. And with respect to the dross, the testimony was, all that coke is burned off, so the only thing that's in the furnace ultimately is the lead. And that is no different than any other raw materials that Alcopacific was using. Alcopacific testified that they occasionally used virgin lead. Guess what? When you process virgin lead, there's going to be waste at the end of the day. So if you are a company that processes raw materials, that company creates a waste. That is the company's responsibility to address. That is the company's responsibility to manage. And if suppliers to their company are all going to be liable for the useful raw materials they sell to the company, who would do business? And that's the whole point of the useful product defense, is that we were selling useful products. The waste that was created was not from our product. The waste was from the manufacturing process that Alcopacific was engaged in. It was Alcopacific's obligation to treat, to take care of that waste. As with any of the thousands and thousands of suppliers that they had and their lead products that were, excuse me, that were being sold to Alcopacific. Well, you know, what you're saying, to be honest, makes commercial sense to me. But there is a line of authority in the circuit that suggests that if you're inevitably going to have some waste created by this process of passing on the product from one company to another, that everybody's on the hook. I mean, that's what Burlington seems to say. It's what Catellus seems to say. It's what Cadillac Fairview seems to say. So why is this different? Well, and with Burlington is another good example. When the — was a useful product. No question. Shell was selling, I think it was pesticides. Was a useful product. But what happened was in the transfer, before the useful product could ever be put to use, inherent in the transfer process were spills, was contamination that would occur. You were controlling the transfer process. You knew that when you transfer that useful product to the supplier that there would be spills. That's not in the record here. There are no spills in the transfer process. The contamination comes from the waste slag that Alco was creating, not from hydrost, not from the slag that was the high lead content slag. The waste product is the end result of Alco Pacific's manufacturing process. And I don't believe this Court has ever held that somebody who processes raw materials, that the waste products from the processor can be attributed to the people that supply the raw materials. That would be — that would create a circular monster that would prevent anybody from doing business with somebody who was processing raw materials. I don't believe that that's happened in the circuit. Okay. I think we have your point. Thank you.  Your time's up? Yeah, it really is. Okay. Fair enough. I was going to — if you had any questions about the Recycling Act, I was going to — It's all well and well briefed. We have them all. Your Honors, I asked counsel whether or not the material was a waste to the defendants at the point it was generated. The answer is yes. For example, P.K. Metals was in the business of selling and manufacturing soldering bars. In that process, when Alco Pacific — excuse me, when P.K. Metals employees skimmed off the dross from these melting pots, they generated something called dead and soldered dross. P.K. Metal understood that that material, once generated, had to be managed as a hazardous waste. They admit in their motion for summary judgment in a declaration submitted by the president of P.K. Metals that that material was a hazardous waste once generated. And just because that material is sold to a third party doesn't mean that that waste is magically converted to a product for which no liability under CERCLA extends. This Court in Louisiana v. Esarco considered the issue whether or not slag, which was considered to be a commercial product under Washington State law, whether that product could at the same time give rise to liability under CERCLA when that product was sold. And the Court, this Court, said yes, one person's waste is another person's product. We don't dispute that Alco Pacific found value in those waste materials. Clearly, there was lead in it, and Alco Pacific could extract some, but not all of the lead. Well, what about counsel's point, though, that if you essentially leave them to the because they don't control what Alco does with the material. They sell a useful product to them. Alco mismanages it. They're on the hook. So why would they then just not take the 30 percent lead content material and put it in a hazardous waste disposal site and take it off the market? Well, that precise issue was an issue in the Catellus case, Your Honor, in which the defendants were claiming we have no control over Morris P. Kirk's way of processing the lead batteries that were crushed by Morris P. Kirk. And they, the defendants in that case, claimed we not only not control that process, we don't even own those materials. I understand that, but that's not my question. My question is, as I think he was arguing, the way to then react to the, in the economic chain of events, is not incur that risk, but instead just dump materials that have a usable, demonstrable, usable value. But because of the risk of contingent liability, they're going to just not put it into the market. Absolutely not, Your Honor. They had a choice. They had a choice. Once they generated these materials, RSR, for example, had a choice of processing that second run slag to recover more lead at its own facility, and then when that material was processed, not all of it was extinguished and burned away, as counsel just indicated. No. More slag was generated in that process. I don't think you're answering the question. Let's try this again. The point we understood being made by the defense was that if you put responsibility on these defendants for what happens at the subsequent site, you're going to discourage these defendants from selling this product that somebody else can make use of. And as a result, you're going to throw away or put into a hazardous waste disposal system something that really does have value to somebody else. We don't believe so, Your Honor, because, again, they have the responsibility of making sure that that material is properly managed. So they could themselves process that material, and once processed, they have the responsibility to make sure that it goes to an authorized disposal facility or a facility. Okay. So Davis Wire doesn't have the ability to process it again and get more out. So what should they do? Should they send it straight to the hazardous waste disposal site, or should they give it to somebody else that can squeeze value out of it? They are required under RCRA, another Federal law, to manage that material as a hazardous waste. So you think they should throw it away, even though there is value to be extracted by somebody else? No, Your Honor. I'm not saying that they're required to throw it away. They can sell it. But once they sell it to a third party, they subject themselves to the potential liability. Right. So the choice is to incur the risk of contingent liability from someone they don't control or give it to a hazardous waste disposal, which is then what gets into the ground, but it's under controlled circumstances. It may not sound fair, Your Honor, but, yes, that is the law under CERCLA. You're saying that's the choice Congress made. That is the choice Congress made, Your Honor. All right. Okay. I think we have a point. All right. Thank you. Thank you very much. Interesting case. We appreciate the argument on both sides. And we will stand in recess. Thank you, Your Honor.
judges: Fisher, Clifton, Fogel